Eunice A. Horne v. Commissioner.
Horne v. Commissioner
Docket No. 58274.
United States Tax Court
T.C. Memo 1957-212; 1957 Tax Ct. Memo LEXIS 38; 16 T.C.M. (CCH) 953; T.C.M. (RIA) 57212; November 13, 1957
William R. Frazier, Esq., Atlantic Bank Building, Jacksonville, Fla., for the petitioner. Robert O. Rogers, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioner's income tax for the calendar years 1952 and 1953 in the respective amounts of $252.93 and $327.77. In petitioner's income tax return for the year 1952 she claimed a deduction in the amount of $1,000 as a long-term capital loss, explained in Schedule D as "Promissory Notes Found to be non-collectible During the year 1952," in the amount of $5,725 of which $1,000 was deducted on the return for 1952 and the balance of $4,725 was noted as a "Carry-over to 1953." A similar deduction of $1,000 as a longterm capital loss was taken by taxpayer in her return *39 for 1953 and explained in Schedule D attached thereto as "Promissory Notes Found to Be Non-Collectible During this year 1953" in the amount of $4,725, of which $1,000 was deducted and $3,725 was noted as a "Carry over to 1954." In petitioner's return for 1952 she deducted as a contribution the sum of $105 on account of "American Legion Work" and as a miscellaneous deduction the sum of $5.25, representing dues paid to the American Legion. She also deducted the amount of $5 as dues paid to the University of Florida Alumni Association. In 1953 petitioner deducted the sum of $250 as a contribution to the American Legion. In her return for that year she claimed medical and dental expenses in the total sum of $457.55. Respondent disallowed the capital loss claimed by petitioner in her return for 1952 with the following explanation: "The deduction of $1,000.00 claimed for the alleged worthlessness of a debt of $5,725.00 has been disallowed because it has not been established that a debt within the meaning of section 23(k) of the Internal Revenue Code of 1939 became worthlessness during the year 1952 and because the basis of the alleged debt has not been substantiated." He disallowed *40 the deduction of $1,000 as a claimed capital loss in the return for 1953 with the following explanation: "The deduction of $1,000.00 claimed upon the basis of a capital loss carry over from the taxable year eaded [ended] December 31, 1952 has been disallowed because it has not been established that the loss claimed for the taxable year ended December 31, 1952 was allowable within the meaning of the Internal Revenue Code." Respondent disallowed the deduction taken for each year on account of contributions to the American Legion because the amounts had "not been substantiated in accordance with the requirements of section 23(o) of the Internal Revenue Code of 1939." Respondent disallowed the deductions claimed on account of dues paid to the American Legion and the University of Florida Alumni Association as personal expenses "for which no deduction is allowable due to provisions of section 24(a) of the Internal Revenue Code of 1939." Of the medical and dental expenses claimed for 1953 respondent disallowed as "not substantiated" the sum of $4.16, and of the remainder of $453.39 he allowed an amount as a deduction equal to 5 per cent of "corrected adjusted gross income of $4,673.50." *41 Petitioner concedes the disallowance of the $4.16 item. The issues presented for our decision herein are whether respondent erred in disallowing the deduction of $1,000 claimed in each return as a capital loss in connection with the promissory notes referred to in the return, whether respondent erred in disallowing the deduction claimed for contribution to the American Legion in each return, and whether respondent erred in disallowing the deductions claimed for dues to the Florida Alumni Association and the American Legion in the return for 1952. Findings of Fact Petitioner, who lives in Jacksonville, Florida, filed her Federal income tax returns for the calendar years 1952 and 1953 with the district director of internal revenue for the district of Florida. Petitioner is, and was during the taxable years, a teacher of public speaking and drama at the Robert E. Lee High School in Jacksonville, Florida. She served in the United States Navy from 1942 to 1947. When she went into the Navy she served as lieutenant (jg.), and when she left the Navy she was a lieutenant commander, which grade she continues to hold in the Naval Reserve. Petitioner is a member of the American Legion and *42 during a part of the years 1952 and 1953 she was a district commander of the American Legion in Florida. Her district was composed of 7 counties in northern Florida. Petitioner has also served in the American Legion as a commander of the Woman's Post, as county commander, and as district committeeman. At the present time she is on the National Committee of the American Legion. In 1944 petitioner met Roy E. White while they were both serving in the Navy. At that time their acquaintance was casual. In February 1949 White telephoned petitioner and they renewed their acquaintance. At that time White was a promotional agent or salesman employed by Philip T. Bache who operated a printing shop in Jacksonville. White was anxious to obtain some money with which to participate with Bache in an outdoor advertising venture, and prevailed upon petitioner to loan him money. On October 22, 1949, petitioner loaned to White $725 and received from White his promissory note payable to her order in this amount 90 days after date with not interest. On March 28, 1950, petitioner loaned to White $5,000 and received from him a promissory note payable to her order in that amount 2 years after date "with *43 interest after maturity at the rate of ten per cent per annum until paid." The money petitioner loaned to White represented all of her savings and also included money she borrowed from a bank and from members of her family. She gave it to White in the form of cash. Petitioner made no credit investigations with regard to White, but was persuaded by him that the venture which he contemplated with Bache would be successful. She was acquainted with Bache and knew that he had equipment, materials, and other assets which might be used in the business. Petitioner understood from White that if he was successful in this venture he would give to her some part of his profits from this business in lieu of interest upon the notes. Aside from these notes, there was nothing in writing to evidence the transaction. During the period September 15 to November 18, 1950, petitioner received from White 10 checks in a total amount of $255 as repayments of her loans to White. These checks were drawn to White by "Bache Bros. Sign Co." under the signature of Philip T. Bache, and were endorsed by White to petitioner and cashed by her. During the period September 12 to December 24, 1951, petitioner received *44 15 payments on her loans to White in amounts varying from $3 to $35 and totaling $353. She wrote and signed receipts evidencing these payments. On 12 of them she wrote: "To Apply on Debt"; on 1 of them, "To Apply on Account"; on 1 of them, "To Apply on Account due"; and on 1 of them, "For Christmas - (Applied on loan)." Prior to the payments evidenced by these receipts White had left the employ of Bache and was connected with the Laritz Cafeteria in Jacksonville. In the early part of 1952 petitioner pressed White for payment of these notes, whereupon White became angry and struck petitioner. Shortly thereafter petitioner turned these notes over to an attorney for collection. The attorney had several conversations with White on the telephone, but was unable to effect a personal conference. White acknowledged that he owed petitioner some money on these notes but became annoyed by the attorney's calls, and finally threatened the attorney. The attorney investigated available court records in an unsuccessful effort to find assets belonging to White, and also talked to acquaintances of White. From these investigations, and after he was threatened by White, the attorney advised petitioner *45 in the early part of 1952 that the notes were uncollectible. On or about the 20th of August 1952 petitioner signed the following document: "For and in consideration of the sum of $100 which is the final payment on monies due by Roy E. White, I do hereby agree to leave Mr. White alone - not to phone write or coerce him in any way." There was inserted in this document above petitioner's signature by pencil, and in a handwriting not that of petitioner, the words "Payment Received." This document bears the signature of Philip T. Bache as witness. Bache died before the trial of this case. In connection with petitioner's activities as a district commander of the American Legion during the taxable years, she traveled to post of that organization within her district. She was reimbursed by the American Legion on account of expenditures made by her for gasoline in connection with these trips. During these years petitioner made considerable expenditures in connection with personal expenses incident to her attending various conventions of the American Legion, which expenditures were included by her in computing the amounts deducted as contributions to the American Legion. She also made *46 expenditures in small and unascertainable amounts on account of telephone calls and postage, in connection with her activities as district commander of the American Legion, for which she was not reimbursed. In 1952 petitioner paid $5.25 as dues to the American Legion and $5 as dues to the University of Florida Alumni Association. As a dues-paying member of these organizations she received from each of them a magazine. Opinion KERN, Judge: The principal issue in this case is whether petitioner is entitled to deduct the sum of $1,000 in each of the taxable years on account of advances claimed to have been made by her to White in 1949 and 1950. Petitioner contends that each of these amounts represented "a short-term capital loss suffered by Petitioner in connection with a worthless nonbusiness debt under the provisions of Section 23(k)(4) of the 1939 Code." Respondent contends that the alleged debt of White to petitioner was satisfied in 1952, that the transaction was one entered into for profit and did not result in a debt, that any interest acquired by petitioner as a result of her advances did not become worthless in 1952, and, in the alternative, that the advances constituted *47 a gift and did not result in a debt. Petitioner has the burden of proving the existence of this debt in 1952. In her petition she alleged (and this was denied in respondent's answer) that White had not "paid all or any part of the principal due on the two aforementioned promissory notes held by Petitioner." At the trial herein petitioner was asked on direct examination whether she had received any repayment of the $5,725 advanced by her to White, and answered that she had not. Until and unless we conclude that petitioner has successfully borne her burden of proof as to the existence of this debt in 1952, we do not get to the other arguments of respondent on this issue. After a careful consideration of the transcript and record herein, we are confirmed in the impression we formed at the trial of this case that petitioner's testimony did not give a true and accurate account of the circumstances relating to the promissory notes of Roy E. White, which petitioner contends became worthless in 1952. We come to this conclusion reluctantly because of petitioner's position as a member of the faculty of one of the high schools in Jacksonville, Florida, her commendable war record, and her *48 praiseworthy activities in connection with a distingusihed patriotic organization. However, the contradictions in her testimony, its inherent implausibility, its inconsistency with written documents in evidence, and her demeanor on the witness stand impel us to conclude that her testimony was less than frank and far from an accurate account of the transaction in question. In substance petitioner's story is as follows: She had a casual acquaintance with Roy E. White while both were in the Navy in 1944 but "had almost forgotten him until he called [her] up in February 1949 * * *." He was at that time a "promotional agent" or salesman employed by Philip T. Bache who operated a printing shop in Jacksonville. Petitioner advanced to White $5,725 in order to "be, you might say, a silent partner in an outdoor advertising program with Mr. Bache and Mr. White." Bache had the equipment, place, materials, trucks, and laborers, and White, who "had the time and the ambition and no money," was to be the "promotional agent." Petitioner was to furnish the money. For some unexplained reason she was to give this money to White in the form of cash. Her own savings amounted to $2,225. She borrowed *49 $600 from a bank and $2,900 from members of her family. Without making any investigation of white's financial responsibility or resources, she advanced to him $5,725 in cash, taking in return therefore White's unsecured notes. There was no written contract or partnership agreement. Petitioner testified: "The three of us sat down and discussed it. That's all." Petitioner understood that she was to receive one-third of any profits from the enterprise and, in any event, she was to be repaid by White the amount she advanced to him. She received no payments of any kind and no financial reports concerning the business during 1950, 1951, and 1952. She was shown some papers but she testified: "I don't know what they were. They were just papers." In the early part of 1952, while petitioner and White were sitting in a car parked in a filling station that was closed for the night, petitioner asked him for a "record of what was going on * * *." Thereupon, White became angry and knocked her unconscious, as a result of which she was under the care of a doctor for quite some time. [1]
*50 After White left the employ of Bache, petitioner made no inquiries of Bache, whom she described as a reputable Jacksonville businessman, concerning the existence of any assets of the alleged partnership, made no request for an accounting of the profits, if any, from the partnership business, and took no step looking toward the liquidation of the alleged partnership. On cross-examination petitioner testified that she did not recall ever having loaned White any monies other than the loans evidenced by the notes, and, further, that no repayments had ever been made to her. She was thereupon asked concerning White's use of her automobile. On this point the following questions were asked of her, and she gave the following answers: "Q Didn't he use your automobile in his business? "A A few times. "Q Did he have a car of his own? "A He did at one time. "Q Wasn't he a salesman and, as a matter of fact, being a salesman he was using your car and didn't he wreck your car at one time? "A I don't recall whether he wrecked my car or not." Later in her cross-examination she was shown 10 checks, drawn during the period September 15 to November 18, 1950, indicating payments by White *51 to her in the total amount of $255, and 15 receipts signed by her during the period September 12 to December 24, 1951, indicating the payment to her by White of amounts ranging from $3 to $35 and in a total amount of $353. [2] All of the receipts show the payor to be "Roy E. White Laritz Cafeteria." Petitioner explained these payments as being for the rental of her car. We reject this explanation as untrue for the following reasons: (1) Before being confronted with these checks and receipts, petitioner in effect shrugged off the question of whether White ever used her car by saying: "A few times." She had previously testified to the effect that she had made no loans to White except those evidenced by the notes here in question, and had categorically denied that she had ever received any repayments from White. Then, when she was shown the checks and receipts which indicated a series of payments to her by White during 3 months in 1950 and 4 months in 1951 in a total amount of $608, she stated that they were all payments of rental for the use of her car. When *52 she was recalled to the stand to give rebuttal testimony she was shown the receipt dated August 20, 1952, and was asked by her attorney: "Did you ever get any payments from this Roy E. White on this $5700?" Petitioner answered: "Those that I received were before Mr. Searcy [her attorney] took the case and this is dated after Mr. Searcy and I did not receive any after Mr. Searcy." (Emphasis supplied.) Later, upon insistent questioning of her attorney, she stated that she had never received any payments on the notes. We consider her oral testimony on this point to be contradictory. (2) The receipts were in petitioner's handwriting. On 12 of them she wrote: "To Apply on Debt"; on 1 of them, "To Apply on Account"; on 1 of them, "To Apply on Account due"; and on 1 of them, "For Christmas - (Applied on loan)." On none of them was there any reference to the rental of a car. Her own testimony was to the effect that the checks were received for the same purpose as the cash payments evidenced by the receipts. We consider that her explanation as to these payments is contradicted by written testimony before us. Petitioner categorically denied signing the receipt for $100 dated August 20, 1952. Relying *53 upon the testimony of respondent's witness, a handwriting expert, and our own comparison of the signature thereon with petitioner's admitted signature on documents in evidence, we have concluded that petitioner signed this document. In connection with this receipt petitioner's counsel [3] made the following statement in petitioner's reply brief: "Petitioner repeatedly denied at the trial that she had in fact been paid any money on the indebtedness by White. Admittedly, this [petitioner's testimony in the face of the document dated August 20, 1952] creates some conflict in the evidence which it will be necessary for the Court to resolve. We urge the Court to hold that Petitioner received no payment from White, because we honestly and sincerely believe that Petitioner has never been paid any of the sum in question by White. In this connection, the Court will recall Petitioner's testimony appearing at page 18 of the Transcript that White had repeatedly intimidated Petitioner and had in fact inflicted physical violence on her, which on at least one occasion rendered her unconscious and necessitated her seeking medical treatment. White also threatened Mr. H. M. Searcy, Petitioner's *54 attorney, who was attempting to collect the notes in question." The implication of this statement is that while petitioner may have signed this receipt, she did so under duress. Stated more baldly, the implication is that if petitioner had told the truth instead of flatly denying that she had ever signed this receipt, and had told the whole truth, there would be evidence in the record which would justify us in disregarding this receipt. Unfortunately for petitioner we cannot base our decision of this issue, upon which she has the burden of proof, upon a speculation as to what facts would have been disclosed by the record if she had chosen to testify frankly and truthfully with regard to the matters at issue. Petitioner testified that no repayments had ever been made to her by White on account of her advances to him. Contrary to petitioner's testimony, it has been proved to our satisfaction that she received repayments from White on account of her loans to him of amounts paid to her regularly by him during approximately 2 months *55 in 1951 and approximately 3 months in 1952; and, furthermore, that she signed a document indicating the receipt by her of $100 in August 1952, which is designated therein as "the final payment on monies due by Roy E. White * * *." We therefore reject petitioner's testimony on this question and conclude that petitioner has failed to prove the existence of a debt due to her from White which became worthless in 1952. Petitioner has completely failed to substantiate the amount of unreimbursed expenditures made by her on behalf of the American Legion which she seeks to deduct as contributions to that organization pursuant to the provisions of section 23(o)(4) of the Internal Revenue Code of 1939. The gist of her testimony on this issue is as follows: "Well, when I became District Commander, H. M. Searcy was District Seargent. at arms and Julian Warren was District Adjutant, and in the beginning we installed all of the - I believe 22 posts at that time, and they paid for the gas of those trips, but that was the very beginning, in the very beginning of the term, and there were six posts were about to have their charters withdrawn, and so I talked with the Department Commander, Addision *56 P. Drummond, and the Department Adjutant and asked if they would give me an opportunity to try to revive those six charters before they were taken away and they gave me that opportunity. So I spent quite a bit of time in going back and forth to these six dying posts, they were called, because they were about to have their charters removed, and I also made a lot of telephone calls. I may not have listed them all down, but I can - I could go back and check, but I made many trips and a lot of telephone calls, a lot of postage, and I really think I spent far more than [$105 in 1952 and $250 in 1953]" In view of this general, inconclusive, and uninformative testimony and petitioner's admission that a part of the claimed deduction represented nondeductible expenses incident to attending American Legion conventions, we are unable to conclude that respondent erred in disallowing these deductions. Petitioner also claims deductions as "contributions" of payments of membership dues to the American Legion and the University of Florida Alumni Association. In our opinion petitioner has failed to prove that these payments were in reality "contributions" and were not made in return for a quid *57 pro quo. See Revenue Ruling 54-565, 1954-2 C.B. 95. Even if the payment of dues to the University of Florida Alumni Association were proved to be in reality a contribution, there would still be a failure of proof that that association was one the contributions to which "are to be used exclusively for * * * scientific, literary, or educational purposes * * *." See Estate of Philip R. Thayer, 24 T.C. 384. Decision will be entered for the respondent. Footnotes
1. In another part of her testimony she described this episode by saying "he got very angry * * * and, well, you might say he threatened me."↩
2. There is no explanation in the record as to where or from whom respondent's counsel obtained these checks and receipts.↩
3. Nothing that we say in this opinion is to be taken as a reflection upon petitioner's counsel whose reputation and standing are of the highest.↩